UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

| | |
|---|---|
| CAPSTONE ASSET MANAGEMENT COMPANY, Administrator and Investment Advisor for Capstone Series Fund, Inc., on behalf of its portfolio, Steward Small-Mid Cap Enhanced Index Fund (formerly known as the Capstone Growth Fund), Derivatively on Behalf of EPIQ SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> TOM W. OLOFSON, CHRISTOPHER E. OLOFSON, ELIZABETH M. BRAHAM, DOUGLAS W. FLEMING, SCOTT W. OLOFSON, JANICE E. KATTERHENRY, JAMES A. BYRNES, W. BRYAN SATTERLEE, EDWARD M. CONNOLLY, JR., JOEL PELOFSKY, ROBERT C. LEVY and RON L. JACOBS, <br><br> Defendants, <br><br> – and – <br><br> EPIQ SYSTEMS, INC., a Missouri corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.   08-CV-2418 KHV/JPO

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY AND ACTION FOR ACCOUNTING**

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Epiq Systems, Inc. ("Epiq" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").   This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior Epiq insiders to divert hundreds of millions of dollars of corporate assets to themselves and other employees via the manipulation of grant dates associated with hundreds of thousands of stock options granted to Epiq insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the millions in illicitly obtained incentive compensation and proceeds diverted to them since 1997.

2.     Between 1997 and the present, Defendants also caused Epiq to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Epiq carried with them an exercise price that was ***not less than*** the fair market value of Epiq stock on the date of grant and issuance.

3.     In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be ***backdated*** to dates when the Company's shares were trading at or near the lowest price for that relevant period. By August 2008, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

4.    Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Kansas and Missouri law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused Epiq to issue false statements; (ii) diverted millions of dollars of corporate assets to senior Epiq executives; and (iii) subjected Epiq to potential liability from regulators, including the SEC and the IRS.

5.    Defendants' gross mismanagement and malfeasance over the past decade has exposed Epiq and its senior executives to criminal and civil liability for issuing false and misleading financial statements.   Specifically, Defendants caused or allowed Epiq to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Epiq's earnings and earnings per share.

6.    Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Epiq.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations as to void all grants made pursuant to the plans.  The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding Epiq's internal control problems, abused their fiduciary relationship with the Company by selling nearly $35 million worth of their personally held shares at

artificially inflated prices during the relevant period.  This action seeks recovery for Epiq against these faithless fiduciaries, as Epiq's Board of Directors, as currently composed, is simply unable or unwilling to do so.

### JURISDICTION AND VENUE

7.     The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under Missouri law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  This complaint also asserts violations of Kansas law.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in that plaintiff and the defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.  Moreover, this Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Epiq is located in and conducts its business in this District.  Further, defendants conduct business in this District, and certain of the defendants are citizens of Kansas and reside in this District.

## PARTIES

11.     Plaintiff CAPSTONE ASSET MANAGEMENT COMPANY, Administrator and Investment Advisor for Capstone Series Fund, Inc., on behalf of its portfolio, Steward Small-Mid Cap Enhanced Index Fund (formerly known as the Capstone Growth Fund), Derivatively on Behalf of EPIQ SYSTEMS, INC. ("Capstone") is, and has at relevant times been, a shareholder of Epiq. Capstone holds 4,665 shares and has held Epiq stock since November 2005.  Plaintiff is a citizen of Texas.

12.     Nominal party Epiq is a Missouri corporation with its principal business address located at 501 Kansas Avenue, Kansas City, Kansas 66105.

13.     Defendant Tom W. Olofson ("T. Olofson") has been Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Epiq since July 1988.  During the relevant period, T. Olofson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant T. Olofson sold over 2 million shares of Epiq stock for proceeds of approximately $18.5 million during the relevant period.  T. Olofson is a citizen of Missouri.

14.     Defendant Christopher E. Olofson ("C. Olofson") has served as a director of Epiq since 1995, as Chief Operating Officer ("COO") of the Company since 1996, and as President of the Company since 1998.  Previously, C. Olofson served in various positions from 1988 until he was named to his current positions.  C. Olofson is the son of T. Olofson.  During the relevant period, C. Olofson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant C. Olofson sold nearly 900,000 shares of

Epiq stock for proceeds of approximately $10.5 million during the relevant period.  C. Olofson is a citizen of Illinois.

15.     Defendant Elizabeth M. Braham ("Braham") has served as Executive Vice President, Chief Financial Officer ("CFO") and Corporate Secretary of Epiq since joining the Company in July 2002.  Defendant Braham, by her specialized financial expertise, was in a unique position to understand the business of Epiq as well as its finances, markets and present and future business prospects.  During the relevant period, Braham participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on her knowledge of material non-public information regarding the Company, defendant Braham sold 75,000 shares of Epiq stock for proceeds of approximately $1.3 million during the relevant period.  Braham is a citizen of Kansas.

16.     Defendant Douglas W. Fleming ("Fleming") has served as Director of Finance and Principal Accounting Officer of Epiq since 2004.  During the relevant period, Fleming participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Fleming is a citizen of Missouri.

17.     Defendant Scott W. Olofson ("S. Olofson") serves as Vice President, Corporate Affairs of Epiq.  S. Olofson is the son of T. Olofson and the brother of C. Olofson.  S. Olofson is a citizen of Kansas.

18.     Defendant Janice E. Katterhenry ("Katterhenry") was CFO, Vice President, CFO and Corporate Secretary of Epiq from August 1999 until she relinquished her positions in October 2001.  Defendant Katterhenry, by her specialized financial expertise, was in a unique position to understand the business of Epiq as well as its finances, markets and present and future business prospects.  During the relevant period, Katterhenry participated in the issuance of false and/or misleading

- 5 -

statements, including the preparation of the false and/or misleading press releases and SEC filings. Katterhenry is a citizen of Kansas.

19.     Defendant James A. Byrnes ("Byrnes") has been a director of Epiq since January 2003. Because of Byrnes' position, he knew the adverse non-public information about the business of Epiq, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Compensation Committee, defendant Byrnes controlled the other Defendants' stock option awards.  As a member of the Audit and Nominating and Corporate Governance Committees, defendant Byrnes caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Byrnes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Byrnes is a citizen of Kansas.

20.     Defendant W. Bryan Satterlee ("Satterlee") has been a director of Epiq since 1997. As a member of the Compensation Committee, defendant Satterlee controlled the other Defendants' stock option awards.  As a member (Chair) of the Audit Committee and member of the Nominating and Corporate Governance Committee, defendant Satterlee caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Satterlee participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Satterlee sold over 54,000 shares of Epiq stock for proceeds of approximately $704,000 during the relevant period.  Satterlee is a citizen of New Hampshire.

21.     Defendant Edward M. Connolly, Jr. ("Connolly") has been a director of Epiq since September 1994.  As a member (Chair) of the Nominating and Corporate Governance Committee and a member of the Audit Committee, defendant Connolly caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation Committee, defendant Connolly controlled the other Defendants' stock option awards.  During the relevant period, Connolly participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Connolly is a citizen of Kansas.

22.     Defendant Joel Pelofsky ("Pelofsky") has been a director of Epiq since July 2004.  As a member of the Audit and Nominating and Corporate Governance Committees, defendant Pelofsky caused or allowed the dissemination of the improper public statements described herein.  As a member of the Compensation Committee, defendant Pelofsky controlled the other Defendants' stock option awards.  During the relevant period, Pelofsky participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Pelofsky is a citizen of Missouri.

23.     Defendant Robert C. Levy ("Levy") was a director of Epiq from July 1988 to June 2003.  Additionally, defendant Levy intermittently served as General Counsel to the Company until June 2003, and was a member of the Audit Committee from February 1997 to June 2003 and a member of the Compensation Committee from 2002 to June 2003.  During the relevant period, Levy participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Levy is a citizen of Kansas.

24.     Defendant Ron L. Jacobs ("Jacobs") had served as President, Bankruptcy Solutions, f/k/a Bankruptcy Services LLC ("BSI"), from January 2003 to early 2008.  During the relevant period, Jacobs participated in the issuance of false and/or misleading statements, including the

preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Jacobs sold over 302,000 shares of Epiq stock for proceeds of over $3 million during the relevant period. Jacobs is a citizen of New York.

25.     The defendants identified in ¶¶13-14 and 19-23 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-18 and 24 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-16, 18-20, and 83-24 are referred to herein as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

26.     Each officer and director of Epiq named herein owed the Company and Epiq shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Epiq's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Epiq. Further, the misconduct of Epiq's officers has been ratified by Epiq's Board, which has failed to take any legal action on behalf of the Company against them.

27.     By reason of their positions as officers, directors and fiduciaries of Epiq and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Epiq and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Epiq in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Epiq and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over Epiq to divert assets to themselves via improper and/or unlawful practices. Defendants also had

a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

28.     Because of their positions of control and authority as directors or officers of Epiq, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause Epiq to disseminate false Proxy Statements for 1997 to the present, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Epiq, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to Epiq shareholders and the financial markets but failed to do so.

29.     Between 1997 and the present, Defendants concealed that the stock option grants had been repeatedly and consciously ***backdated*** to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised options granted to Defendants from as early as 1997 to 2008 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

30.     To discharge their duties, the directors of Epiq were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and

financial affairs of Epiq. By virtue of such duties, the officers and directors of Epiq were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Epiq in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Epiq);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Epiq to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of Epiq to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Epiq's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Epiq and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Epiq's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in Epiq stock by the officers and employees of Epiq; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from Epiq and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Epiq and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

31.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Epiq, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Epiq's entire Board during the relevant period.

32.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. As a result,

Epiq has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

        (a)      improvidently paid executive compensation;

        (b)      increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

        (c)      costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

        (d)      incurring possible IRS penalties for improperly reporting compensation.

33.     These actions have irreparably damaged Epiq's corporate image and goodwill.  For at least the foreseeable future, Epiq will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Epiq's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

35.     During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to Epiq insiders and directors and causing Epiq to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Epiq and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Epiq, regarding Defendants' compensation practices and Epiq's financial performance.

36.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Epiq common stock so they could dispose of millions of dollars of their own Epiq stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

37.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Epiq's financial results.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

38.     Each of the Defendants aided and abetted and rendered substantial  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

39.     Epiq is a provider of integrated technology solutions for the legal profession.  Epiq offers technology solutions for electronic discovery, document review, legal notification, claims administration and controlled disbursement of funds.  The Company's business is organized into three operating segments.  The electronic discovery segment provides processing and search and review services to companies and the litigation departments of law firms.  The bankruptcy trustee segment provides the bankruptcy trustees with software that enables them to administer a large

volume of cases simultaneously. Through its settlements and claims segment, Epiq provides clients with back-office administrative support services related to complex legal proceedings that involve notification of claimants or creditors, as well as the administration of funds related to settlement with the class of claimants or creditors for Chapter 11 bankruptcies, and class action and mass tort lawsuits.

40.     Throughout the relevant period, Defendants caused Epiq to grant them millions of stock options permitting them to buy Epiq stock for pennies on the dollar which they could in turn sell as the Company's stock price increased. A stock option gives the holder the right to buy a stock at a certain price in the future. Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

41.     However, many of the millions of options granted to Epiq's executives had a hidden, valuable component: they were misdated, often making them even more significantly valuable. The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

## STOCK OPTION GRANTS

42.     Complicating matters and magnifying the harm to Epiq, during the relevant period, Epiq's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

43.     Specifically, in many instances the reported dates Epiq stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

44.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to Epiq a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems Epiq faced because of its deficient internal controls.  Furthermore, Defendants who were members of the Audit Committee during the relevant period had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and

rating agencies. Defendants, as directors or officers of Epiq, had ample opportunity to discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Epiq to the investing public and the Company's shareholders during the relevant period.

45.     Specifically, since at least 1997, Defendants have caused Epiq to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR[1] | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1997 | $.36 | $.03 |
| 1998 | $1.32 | $.09 |
| 1999 | $1.50 | $.13 |
| 2000 | $2.13 | $.16 |
| 2001 | $4.94 | $.29 |
| 2002 | $8.23 | $.45 |
| 2003 | $8.71 | $.65 |
| 2004 | $9.73 | $.59 |
| 2005 | $-3.84 | $.58 |
| 2006 | $35.13 | $.25 |
| 2007 | $6.93 | $.41 |

46.     Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated. The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period. In total,

_____

[1]     Epiq's fiscal year ends December 31.

during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

47.     Moreover, throughout the relevant period, certain Defendants also sold much – nearly $35 million worth – of their Epiq stock.

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| BRAHAM | 6/11/2007 | 19,352 | $17.50 | $338,660 |
|  | 6/11/2007 | 7,700 | $17.32 | $133,364 |
|  | 6/11/2007 | 7,617 | $17.75 | $135,202 |
|  | 6/11/2007 | 5,503 | $17.31 | $95,257 |
|  | 6/11/2007 | 5,100 | $17.33 | $88,383 |
|  | 6/11/2007 | 5,000 | $17.60 | $88,000 |
|  | 6/11/2007 | 3,500 | $17.30 | $60,550 |
|  | 6/11/2007 | 3,400 | $17.51 | $59,534 |
|  | 6/11/2007 | 3,200 | $17.45 | $55,840 |
|  | 6/11/2007 | 2,800 | $17.36 | $48,608 |
|  | 6/11/2007 | 2,000 | $17.34 | $34,680 |
|  | 6/11/2007 | 1,941 | $17.55 | $34,065 |
|  | 6/11/2007 | 1,907 | $17.71 | $33,773 |
|  | 6/11/2007 | 1,639 | $17.97 | $29,453 |
|  | 6/11/2007 | 1,300 | $17.59 | $22,867 |
|  | 6/11/2007 | 1,197 | $17.35 | $20,768 |
|  | 6/11/2007 | 744 | $17.65 | $13,132 |
|  | 6/11/2007 | 600 | $17.44 | $10,464 |
|  | 6/11/2007 | 500 | $17.57 | $8,785 |
|  |  | 75,000 |  | $1,311,384 |
| BYRNES | 7/27/2007 | 7,000 | $17.00 | $119,000 |
| FLEMING | 9/13/2007 | 4,400 | $18.35 | $80,740 |
|  | 9/13/2007 | 750 | $18.40 | $13,800 |
|  | 9/13/2007 | 100 | $18.43 | $1,843 |
|  |  | 5,250 |  | $96,383 |
| JACOBS | 5/4/2005 | 14,245 | $10.23 | $145,731 |
|  | 5/5/2005 | 2,470 | $10.21 | $25,224 |
|  | 5/6/2005 | 25,986 | $10.04 | $260,899 |
|  | 5/6/2005 | 15,000 | $10.03 | $150,450 |
|  | 5/6/2005 | 15,000 | $10.03 | $150,450 |
|  | 5/6/2005 | 11,907 | $10.10 | $120,261 |
|  | 5/6/2005 | 10,950 | $10.04 | $109,938 |

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| | 5/6/2005 | 4,050 | $10.08 | $40,824 |
| | 5/6/2005 | 3,093 | $10.12 | $31,301 |
| | 5/6/2005 | 738 | $10.06 | $7,424 |
| | 5/6/2005 | 127 | $10.03 | $1,279 |
| | 5/9/2005 | 45,000 | $10.00 | $450,000 |
| | 5/9/2005 | 30,000 | $10.03 | $300,900 |
| | 5/9/2005 | 30,000 | $10.03 | $300,900 |
| | 5/9/2005 | 15,000 | $10.01 | $150,150 |
| | 5/9/2005 | 15,000 | $10.03 | $150,450 |
| | 5/9/2005 | 3,819 | $10.02 | $38,266 |
| | 5/9/2005 | 3,750 | $10.01 | $37,537 |
| | 6/9/2005 | 12,160 | $11.00 | $133,765 |
| | 6/9/2005 | 6,000 | $11.10 | $66,600 |
| | 6/9/2005 | 2,850 | $11.14 | $31,749 |
| | 6/9/2005 | 2,251 | $11.03 | $24,834 |
| | 6/9/2005 | 1,966 | $11.10 | $21,828 |
| | 6/9/2005 | 1,381 | $11.02 | $15,224 |
| | 6/9/2005 | 1,350 | $11.11 | $14,998 |
| | 6/9/2005 | 1,350 | $11.22 | $15,147 |
| | 6/9/2005 | 1,200 | $11.13 | $13,356 |
| | 6/9/2005 | 1,167 | $11.07 | $12,919 |
| | 6/9/2005 | 1,144 | $11.05 | $12,647 |
| | 6/9/2005 | 1,050 | $11.06 | $11,613 |
| | 6/9/2005 | 1,050 | $11.15 | $11,707 |
| | 6/9/2005 | 981 | $11.00 | $10,791 |
| | 6/9/2005 | 750 | $11.20 | $8,400 |
| | 6/9/2005 | 600 | $11.06 | $6,636 |
| | 6/9/2005 | 600 | $11.12 | $6,672 |
| | 6/9/2005 | 600 | $11.14 | $6,684 |
| | 6/9/2005 | 354 | $11.04 | $3,908 |
| | 6/9/2005 | 150 | $11.08 | $1,662 |
| | 6/9/2005 | 150 | $11.16 | $1,674 |
| | 6/9/2005 | 150 | $11.20 | $1,680 |
| | 6/9/2005 | 57 | $11.22 | $639 |
| | 6/10/2005 | 6,250 | $10.86 | $67,880 |
| | 6/10/2005 | 4,836 | $10.86 | $52,519 |
| | 6/10/2005 | 2,550 | $10.94 | $27,897 |
| | 6/10/2005 | 1,800 | $10.90 | $19,620 |
| | 6/10/2005 | 1,200 | $10.93 | $13,116 |
| | 6/10/2005 | 300 | $10.90 | $3,270 |
| | | 302,386 | | $3,091,417 |
| | | | | |
| KATTERHENRY | 10/29/2001 | 2,250 | $13.73 | $30,892 |
| | 10/29/2001 | 2,250 | $13.75 | $30,937 |
| | 10/29/2001 | 1,125 | $13.68 | $15,390 |
| | 10/30/2001 | 2,250 | $13.35 | $30,037 |

- 18 -

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| | 10/30/2001 | 1,125 | $13.42 | $15,097 |
| | 10/30/2001 | 1,125 | $13.42 | $15,097 |
| | 11/1/2001 | 2,250 | $13.44 | $30,240 |
| | 11/2/2001 | 2,250 | $13.38 | $30,105 |
| | 11/2/2001 | 1,125 | $13.48 | $15,165 |
| | 11/2/2001 | 1,116 | $13.35 | $14,898 |
| | 11/2/2001 | 9 | $13.37 | $120 |
| | 11/19/2001 | 2,466 | $17.15 | $42,292 |
| | 11/19/2001 | 909 | $17.22 | $15,653 |
| | | 20,250 | | $285,924 |
| | | | | |
| LEVY | 2/23/1998 | 25,312 | $4.81 | $121,753 |
| | | | | |
| C. OLOFSON | 6/2/1998 | 101,250 | $3.30 | $334,125 |
| | 6/29/2001 | 123,750 | $10.66 | $1,319,174 |
| | 10/30/2001 | 20,475 | $13.33 | $272,931 |
| | 10/31/2001 | 2,250 | $13.40 | $30,150 |
| | 10/31/2001 | 1,231 | $13.51 | $16,627 |
| | 10/31/2001 | 900 | $13.33 | $11,997 |
| | 10/31/2001 | 675 | $13.33 | $8,998 |
| | 10/31/2001 | 675 | $13.33 | $8,998 |
| | 10/31/2001 | 232 | $13.42 | $3,110 |
| | 12/11/2002 | 15,000 | $10.06 | $150,900 |
| | 12/11/2002 | 6,000 | $10.00 | $60,000 |
| | 12/11/2002 | 3,750 | $10.03 | $37,612 |
| | 12/11/2002 | 3,000 | $10.06 | $30,180 |
| | 12/11/2002 | 2,850 | $10.03 | $28,585 |
| | 12/11/2002 | 2,550 | $10.00 | $25,500 |
| | 12/11/2002 | 2,550 | $10.02 | $25,551 |
| | 12/11/2002 | 2,400 | $9.97 | $23,928 |
| | 12/11/2002 | 1,950 | $10.04 | $19,578 |
| | 12/11/2002 | 1,650 | $10.06 | $16,599 |
| | 12/11/2002 | 1,050 | $10.07 | $10,573 |
| | 12/11/2002 | 750 | $10.05 | $7,537 |
| | 12/11/2002 | 600 | $10.04 | $6,024 |
| | 12/11/2002 | 450 | $10.04 | $4,518 |
| | 12/11/2002 | 450 | $10.05 | $4,522 |
| | 5/5/2003 | 30,000 | $14.90 | $447,000 |
| | 5/5/2003 | 15,000 | $14.93 | $223,950 |
| | 5/5/2003 | 9,000 | $14.92 | $134,280 |
| | 5/5/2003 | 6,000 | $15.00 | $90,000 |
| | 5/3/2005 | 34,050 | $10.00 | $340,500 |
| | 5/3/2005 | 21,900 | $10.00 | $219,000 |
| | 5/3/2005 | 21,000 | $10.04 | $210,840 |

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| | 5/3/2005 | 16,500 | $10.00 | $165,000 |
| | 5/3/2005 | 11,400 | $10.20 | $116,280 |
| | 5/3/2005 | 8,100 | $10.13 | $82,053 |
| | 5/3/2005 | 7,050 | $10.21 | $71,980 |
| | 9/27/2005 | 10,500 | $14.27 | $149,835 |
| | 9/27/2005 | 10,500 | $14.28 | $149,940 |
| | 9/27/2005 | 4,500 | $14.30 | $64,350 |
| | 9/27/2005 | 1,500 | $14.29 | $21,435 |
| | 3/6/2006 | 42,648 | $13.94 | $594,513 |
| | 3/7/2006 | 54,852 | $13.36 | $732,822 |
| | 3/8/2006 | 22,500 | $13.18 | $296,550 |
| | 5/3/2007 | 29,400 | $15.20 | $446,880 |
| | 5/3/2007 | 22,050 | $15.40 | $339,570 |
| | 5/3/2007 | 16,500 | $15.19 | $250,635 |
| | 5/3/2007 | 16,050 | $15.34 | $246,207 |
| | 5/3/2007 | 12,627 | $15.16 | $191,425 |
| | 5/3/2007 | 8,130 | $15.14 | $123,088 |
| | 5/3/2007 | 7,500 | $15.13 | $113,475 |
| | 5/3/2007 | 7,350 | $15.40 | $113,190 |
| | 5/3/2007 | 5,988 | $15.56 | $93,173 |
| | 5/3/2007 | 5,538 | $15.48 | $85,728 |
| | 5/3/2007 | 4,909 | $15.16 | $74,428 |
| | 5/3/2007 | 3,703 | $15.43 | $57,145 |
| | 5/3/2007 | 3,000 | $15.60 | $46,800 |
| | 5/3/2007 | 2,400 | $15.33 | $36,792 |
| | 5/3/2007 | 1,500 | $15.18 | $22,770 |
| | 5/3/2007 | 1,210 | $15.14 | $18,327 |
| | 5/3/2007 | 1,087 | $15.70 | $17,074 |
| | 5/3/2007 | 600 | $15.42 | $9,252 |
| | 5/3/2007 | 450 | $15.58 | $7,011 |
| | 5/3/2007 | 6 | $15.54 | $93 |
| | 4/30/2008 | 25,000 | $15.40 | $385,000 |
| | 4/30/2008 | 15,000 | $15.35 | $230,250 |
| | 4/30/2008 | 13,125 | $15.50 | $203,438 |
| | 4/30/2008 | 10,000 | $15.45 | $154,500 |
| | 4/30/2008 | 10,000 | $15.48 | $154,800 |
| | 4/30/2008 | 5,000 | $15.31 | $76,550 |
| | 4/30/2008 | 5,000 | $15.36 | $76,800 |
| | 4/30/2008 | 5,000 | $15.41 | $77,050 |
| | 4/30/2008 | 5,000 | $15.46 | $77,300 |
| | 4/30/2008 | 5,000 | $15.49 | $77,450 |
| | 4/30/2008 | 4,089 | $15.33 | $62,684 |
| | 4/30/2008 | 911 | $15.38 | $14,011 |
| | | 876,562 | | $10,450,936 |
| | | | | |
| T. OLOFSON | 6/2/1998 | 742,499 | $3.30 | $2,450,248 |

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|---|
| | 6/29/2001 | 944,999 | $10.66 | $10,073,690 |
| | 11/15/2001 | 3,375 | $16.91 | $57,071 |
| | 11/15/2001 | 2,947 | $16.44 | $48,457 |
| | 11/15/2001 | 2,925 | $16.55 | $48,409 |
| | 11/15/2001 | 2,745 | $16.51 | $45,320 |
| | 11/15/2001 | 1,309 | $16.48 | $21,580 |
| | 11/15/2001 | 675 | $16.47 | $11,117 |
| | 11/15/2001 | 506 | $16.49 | $8,348 |
| | 11/15/2001 | 450 | $16.86 | $7,587 |
| | 11/15/2001 | 450 | $16.88 | $7,596 |
| | 11/15/2001 | 225 | $16.48 | $3,708 |
| | 11/15/2001 | 225 | $16.84 | $3,789 |
| | 11/15/2001 | 112 | $16.11 | $1,812 |
| | 11/16/2001 | 16,200 | $16.08 | $260,496 |
| | 11/16/2001 | 9,787 | $16.11 | $157,676 |
| | 11/16/2001 | 6,379 | $16.00 | $102,060 |
| | 11/16/2001 | 6,138 | $16.44 | $100,909 |
| | 11/16/2001 | 4,500 | $16.33 | $73,485 |
| | 11/16/2001 | 1,575 | $16.11 | $25,373 |
| | 11/16/2001 | 1,350 | $16.06 | $21,681 |
| | 11/16/2001 | 1,125 | $16.22 | $18,247 |
| | 11/16/2001 | 900 | $16.16 | $14,544 |
| | 11/16/2001 | 900 | $16.42 | $14,778 |
| | 11/16/2001 | 675 | $16.55 | $11,171 |
| | 11/16/2001 | 450 | $16.03 | $7,213 |
| | 11/16/2001 | 450 | $16.12 | $7,254 |
| | 11/16/2001 | 225 | $16.00 | $3,600 |
| | 11/16/2001 | 225 | $16.01 | $3,602 |
| | 11/16/2001 | 225 | $16.23 | $3,652 |
| | 11/16/2001 | 225 | $16.38 | $3,685 |
| | 11/16/2001 | 225 | $16.56 | $3,726 |
| | 5/12/2005 | 56,175 | $9.96 | $559,503 |
| | 5/12/2005 | 16,500 | $9.98 | $164,670 |
| | 5/12/2005 | 15,000 | $9.97 | $149,550 |
| | 5/12/2005 | 13,425 | $10.00 | $134,250 |
| | 5/12/2005 | 7,500 | $9.96 | $74,700 |
| | 5/12/2005 | 7,500 | $9.96 | $74,700 |
| | 5/12/2005 | 7,500 | $9.96 | $74,700 |
| | 5/12/2005 | 7,500 | $9.97 | $74,775 |
| | 5/12/2005 | 7,500 | $9.97 | $74,775 |
| | 5/12/2005 | 7,500 | $9.97 | $74,775 |
| | 5/12/2005 | 3,900 | $10.06 | $39,234 |
| | 9/22/2005 | 26,619 | $13.86 | $368,939 |
| | 9/22/2005 | 11,250 | $13.89 | $156,262 |
| | 9/22/2005 | 11,035 | $13.70 | $151,186 |
| | 9/22/2005 | 8,550 | $14.00 | $119,700 |
| | 9/22/2005 | 7,500 | $13.83 | $103,725 |

- 21 -

| DEFENDANT | DATE | SHARES | PRICE | PROCEEDS |
|-----------|------|--------|-------|----------|
| | 9/22/2005 | 6,523 | $14.03 | $91,525 |
| | 9/22/2005 | 5,250 | $13.91 | $73,027 |
| | 9/22/2005 | 4,311 | $13.90 | $59,923 |
| | 9/22/2005 | 3,750 | $13.67 | $51,262 |
| | 9/22/2005 | 3,750 | $13.74 | $51,525 |
| | 9/22/2005 | 3,750 | $13.84 | $51,900 |
| | 9/22/2005 | 3,750 | $13.90 | $52,125 |
| | 9/22/2005 | 3,750 | $13.92 | $52,200 |
| | 9/22/2005 | 3,750 | $13.95 | $52,312 |
| | 9/22/2005 | 3,750 | $14.05 | $52,687 |
| | 9/22/2005 | 3,750 | $14.09 | $52,837 |
| | 9/22/2005 | 750 | $14.02 | $10,515 |
| | 9/22/2005 | 711 | $13.87 | $9,861 |
| | 6/15/2007 | 112,500 | $16.10 | $1,811,250 |
| | | 2,129,998 | | $18,490,275 |
| | | | | |
| SATTERLEE | 2/20/1998 | 10,125 | $4.81 | $48,701 |
| | 10/29/2001 | 6,750 | $13.33 | $89,977 |
| | 10/29/2001 | 2,250 | $13.34 | $30,015 |
| | 10/29/2001 | 450 | $13.40 | $6,030 |
| | 10/29/2001 | 225 | $13.34 | $3,001 |
| | 10/29/2001 | 225 | $13.40 | $3,015 |
| | 10/29/2001 | 225 | $13.40 | $3,015 |
| | 10/31/2001 | 6,750 | $13.44 | $90,720 |
| | 11/1/2001 | 4,725 | $13.37 | $63,173 |
| | 11/1/2001 | 1,575 | $13.51 | $21,278 |
| | 11/1/2001 | 450 | $13.51 | $6,079 |
| | 9/20/2005 | 6,000 | $14.25 | $85,500 |
| | 12/14/2005 | 5,433 | $12.56 | $68,238 |
| | 9/14/2007 | 3,610 | $19.37 | $69,926 |
| | 9/14/2007 | 3,000 | $19.40 | $58,200 |
| | 9/14/2007 | 1,900 | $19.27 | $36,613 |
| | 9/14/2007 | 1,000 | $19.19 | $19,190 |
| | 9/14/2007 | 100 | $19.48 | $1,948 |
| | 9/14/2007 | 15 | $19.38 | $291 |
| | | 54,808 | | $704,910 |

48.     In effect, during the relevant period, the Defendants caused Epiq's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed Epiq to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial

reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Epiq's earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

49.     Plaintiff brings this action derivatively in the right and for the benefit of Epiq to redress injuries suffered and to be suffered by Epiq as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

50.     Plaintiff will adequately and fairly represent the interests of Epiq and its shareholders in enforcing and prosecuting its rights.

51.     Plaintiff is an owner of Epiq stock and was an owner of Epiq stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

52.     Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Epiq Board of Directors to institute this action against the officers and members of the Epiq Board of Directors is excused as futile.  A pre-filing demand would be a useless and futile act because:

(a)     The members of Epiq's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

- 23 -

(b)     The Epiq Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Epiq's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they owed to Epiq and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.  Certain directors are also dominated and controlled by other directors and cannot act independently of them.  Thus, the Epiq Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by Epiq's officers and directors and these acts are incapable of ratification.

(d)     The members of Epiq's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)     Any suit by the current directors of Epiq to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they

are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)      Epiq has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Epiq any part of the damages Epiq suffered and will suffer thereby.

(g)      In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)      Epiq's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Epiq. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Epiq against these Defendants, known as, *inter alia,* the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Epiq, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i)      In order to bring this action for breaching their fiduciary duties, the members of the Epiq Board would have been required to sue themselves and/or their fellow directors and

allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

53.     Plaintiff has not made any demand on shareholders of Epiq to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Epiq is a publicly traded company with approximately 35.5 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON EPIQ'S FINANCIAL STATEMENTS

### The Fiscal 2000 Form 10-K405

54.     On or about March 27, 2001, the Company filed its fiscal 2000 Form 10-K405 with the SEC. The 2000 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2000 Form 10-K405 included Epiq's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

### The Fiscal 2001 Form 10-K405

55.     On or about March 21, 2002, the Company filed its fiscal 2001 Form 10-K405 with the SEC. The 2001 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2001 Form 10-K405 included Epiq's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock

options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

56. On or about March 20, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC. The 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form 10-K included Epiq's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

57. On or about March 9, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC. The 2003 Form 10-K was simultaneously distributed to shareholders and the public. The 2003 Form 10-K included Epiq's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

58. On or about March 1, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC. The 2004 Form 10-K was simultaneously distributed to shareholders and the public. The 2004 Form 10-K included Epiq's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

59.     On or about March 8, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC. The 2005 Form 10-K was simultaneously distributed to shareholders and the public. The 2005 Form 10-K included Epiq's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2006 Form 10-K**

60.     On or about March 9, 2007, the Company filed its fiscal 2006 Form 10-K with the SEC. The 2006 Form 10-K was simultaneously distributed to shareholders and the public. The 2006 Form 10-K included Epiq's 2006 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2007 Form 10-K**

61.     On or about March 4, 2008, the Company filed its fiscal 2007 Form 10-K with the SEC. The 2007 Form 10-K was simultaneously distributed to shareholders and the public. The 2007 Form 10-K included Epiq's 2007 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, Epiq's compensation expense was understated and its net earnings were overstated.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

62.     The 1997-2008 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on

proxy proposals between 1997 and 2008.  In fact, it was not until July 2008 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of Epiq, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

63.     Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions.  Given the many times Epiq's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

64.     As a result of the backdating of options, Defendants have been unjustly enriched at the expense of Epiq, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

65.     The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Epiq's public investors that Epiq's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

66.     Epiq's public investors had no reason to know of the Defendants' breaches of their

fiduciary duties until August 5, 2008, when Epiq filed a Form 8-K with the SEC, which stated in

part:

> On July 30, 2008, Epiq Systems, Inc. was notified that a complaint, styled
> Alaska Electrical Pension Fund, derivatively on behalf of Epiq Systems, Inc.,
> plaintiff, v. Tom W. Olofson, et al, defendants, and Epiq Systems, Inc., nominal
> defendant, was filed in the U.S. District Court for the District of Kansas.  The
> complaint is a purported shareholder derivative action against the current members of
> the board of directors of the company, certain of its executives, a former director and
> a former executive.  The complaint alleges that the company backdated certain stock
> options from 1997 through January 2006, that the individual defendants either
> participated in the backdating or permitted it to occur, violations of generally
> accepted accounting principles and related claims of false and misleading proxy
> statements and annual reports filed by the company under the Securities Exchange
> Act of 1934 as a result of the purported backdating of options.  The complaint also
> alleges various violations of state law, breaches of fiduciary duty of loyalty and
> insider trading in Epiq Systems stock.  Plaintiff is seeking unspecified money
> damages, an accounting for profits obtained from the alleged backdating of options,
> specified changes in the company's corporate governance policies, punitive damages
> and rescission of the allegedly backdated options.
>
> As of the date of this report, the company has not been served in this matter.
> The company will defend against these claims vigorously.

67.     Subsequently, CEO T. Olofson issued a statement in a press release, which stated in

part:

> Epiq Systems, Inc. (NASDAQ:EPIQ), Kansas City, Kansas, today
> commented on the recent notification of a purported shareholder derivative action by
> a third party alleging fraudulent activity related to backdating of stock options and
> related claims by various Epiq Systems directors and executives. While the claim has
> been filed in the United States District Court of Kansas, the company has not yet
> been served. The company indicated that the claims have no merit.
>
> Tom W. Olofson, Epiq Systems chairman and CEO commented, "Epiq
> Systems has always followed the highest standards of corporate governance practices
> and will continue to do so. We take our disclosure requirements very seriously and
> apply significant attention to all regulatory compliance. We will defend against these
> claims vigorously."

68.     Finally, as fiduciaries of Epiq and its public shareholders, the Defendants cannot rely

on any limitations defense where they withheld from Epiq's public shareholders the facts that give

rise to the claims asserted herein, *i.e.,* that the Epiq Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

69.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

71.     The 1997-2008 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing Epiq to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1997.

72.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

73.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders'

endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

74.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     At all relevant times, Defendants, as directors and/or officers of Epiq, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

77.     In breach of their fiduciary duties owed to Epiq and its shareholders, the Defendants caused Epiq, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Epiq and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Epiq and its shareholders.

78.     The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

79.     As a result of Defendants' misconduct, Epiq has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

80.     Plaintiff demands an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of

the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

81.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.    Each of the Defendants agreed to and did participate with the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

83.    The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Epiq and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Epiq and its shareholders.

84.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Epiq and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

85.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Epiq and its public shareholders.

86.    As a proximate result of Defendants' conduct, Epiq has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.     Directing Epiq to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)     a proposal requiring that the office of CEO of Epiq and Chairman of the Epiq Board of Directors be permanently held by separate individuals and that the Chairman of the Epiq Board meets rigorous "independent" standards;

(ii)     a proposal to strengthen the Epiq Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)     appropriately test and then strengthen the internal audit and control function;

(iv)     rotate independent auditing firms every five years;

(v)     control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)     reform executive compensation.

D.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.      As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

H.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates the place of trial to be Kansas City, Kansas.


DATED: September 9, 2008

Respectfully Submitted,

*/s/ Robert P. Numrich*

| Lee M. Baty | #70304 |
|---|---|
| Robert P. Numrich | #12356 |

BATY, HOLM & NUMRICH, P.C.
4600 Madison Avenue, Suite 210
Kansas City, Missouri 64112-3012
(816) 531-7200
FAX: (816) 531-7201
bnumrich@batyholm.com
tjohnson@batyholm.com

Alfred G. Yates, Jr.
LAW OFFICES OF ALFRED G.
    YATES, JR., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone: 412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

ATTORNEYS FOR PLAINTIFF

VERIFICATION

I, _Edward L. Joroski_, hereby verify that I am familiar with the allegations in

the Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws and

State Law Claims for Breach of Fiduciary Duty and Action for Accounting, and that I have

authorized the filing of the Verified Shareholder Derivative Complaint for Violations of the Federal

Securities Laws and State Law Claims for Breach of Fiduciary Duty and Action for Accounting, and

that the foregoing is true and correct to the best of my knowledge, information and belief.

CAPSTONE ASSET MANAGEMENT
COMPANY

DATED: _September 5, 2008_      By: _Edward L. Joroski_

Its: _President_